HOLLOWAY & SON CONSTRUCTION
COMPANY, INC., Movant,

v.

MATTINGLY BRIDGE COMPANY,
INC., Respondent.

Supreme Court of Kentucky.

May 1, 1979.

Rehearing Denied July 3, 1979.

Leon Seidman, Louisville, Amos H. Eblen, Eblen, Milner, Rosenbaum & Wilson, Lexington, E. Gaines Davis, Jr., Frankfort, for movant.

William A. Young, Frankfort, for respondent.

STERNBERG, Justice.

This litigation grew out of a contract for highway construction. For convenience, we will refer to Holloway & Son Construction Company, Inc., as "Holloway," to Mattingly Bridge Company, Inc., as "Mattingly," and

to the Commonwealth of Kentucky, Department of Transportation, Bureau of Highways, as "Department."

In January, 1971, Holloway entered into a contract with the Department for the construction of an 8-mile section of the Bowling Green-Somerset Parkway. On February 9, 1971, Holloway entered into two contracts with Mattingly for the bridge and concrete structures. The two contracts will be referred to as "Contract A" and "Contract B." Contract A is a "place only" contract and Contract B is what is known as a "place and furnish" contract. In other words, under the terms and provisions of Contract A, Holloway agreed to furnish the materials and Mattingly was obligated to place them, while under Contract B Mattingly was obligated to furnish and place the materials. Both contracts contained the provision: "This subcontract is entered into subject to the approval of the Kentucky Department of Highways." As between the parties, however, this provision was a farce. They both knew and agreed at the time of the execution of the two contracts that only Contract A would be submitted to the Department for approval and that they would actually operate under the conditions of Contract B. Contract A was submitted to and approved by the Department; Contract B was not submitted to nor approved by the Department. For all practical purposes, the contracts are identical as to the items of construction. They differ greatly, however, in the manner in which they were to be performed. For example, under Contract B, page 3a, there is an item, No. 8.0, dealing with "Furnishing 12 BP 53 Steel Piles," while under Contract A there is no such item. Item Numbers 3, 4, 10, 11, 14, 15, 16 and 17 of Contract B differ from the corresponding numbered items in Contract A. Furthermore, under Contract B, Item Number 15(2), page 5, provides, "The contractor will pay for all materials at the prices negotiated by the subcontractor and deduct same in full from payments due subcontractor." The corresponding numbered item in Contract A provides, "The Contractor will furnish ready mix concrete for item numbers 3 and 4,

precase prestressed concrete beam type 3 for item number 10, high strength handrail for item number 11, steel reinforcement for item number 14, and structural steel for item numbers 15, 16, and 17."

Shortly after the date of the approval of Contract A, Mattingly commenced to work, and the project was completed in the late summer or early fall for 1972. On or about May 19, 1972, Mattingly filed a mechanic's and materialman's lien against Holloway in the office of the County Court Clerk of Franklin County, Kentucky. KRS 376.195. On June 2, 1972, Mattingly filed an amended statement of lien, and again on August 9, 1972, filed a second amended statement of lien. The original statement of lien charged that Holloway was indebted to Mattingly ". . . for labor and materials furnished by the claimant-lienor (Mattingly) at the instance and request of the debtor-lienee (Holloway) for the prosecution of work required of the debtor-lienee under its contract . . . . In addition, it is anticipated that the claimant-lienor will furnish and deliver to the debtor-lienee further labor and materials for incorporation into the above referenced projects . . .." Each of the amendments likewise charged that Mattingly performed work and furnished materials in the performance of the said contract.

On June 16, 1972, Mattingly filed suit in the Franklin Circuit Court, in which Holloway and the Department were named defendants. The complaint charged that Mattingly furnished labor and materials to Holloway, which labor and materials were used in the performance of the contract. In its complaint Mattingly sought to recover from Holloway for "labor and materials" furnished by Mattingly to Holloway. By an amended complaint Mattingly charged that he continued to furnish labor and materials to Holloway for use on the subject project. Holloway filed an answer, counterclaim and cross-complaint. It was a general traverse of the indebtedness claimed by Mattingly, other than for a retainer which was being properly held by Holloway. By counterclaim, Holloway sought to recover compen-

satory and punitive damages from Mattingly for the wrongful filing of the lien statement and the amendments thereto. Holloway also sought to recover from Mattingly for liquidated damages assessed against Holloway by the Department for the delay in the completion of the project. In the cross-complaint Holloway charged that an actual controversy existed regarding what funds were due Holloway from the Department, to which the lien of Mattingly attached. Holloway charged that the Department refused to release to it monies rightfully belonging to it which are not subject to the Mattingly lien. It requested that the Department be directed to pay to it the amount of such monies being held by the Department over and above any claim of Mattingly's.

The case was tried to the court. On July 3, 1974, the trial judge filed a "Memo Opinion" and on July 11, 1974, filed "Findings of Fact, Conclusions of Law and Judgment." The trial court held that the rights of the parties were fixed by the terms and conditions of Contract A; that Holloway acquiesced in and waived the failure of Mattingly to execute a performance bond called for by the subcontract; that Mattingly should not recover interest on any retainage; that there is no evidence to support Holloway's claim against Mattingly for liquidated damages by reason of delay in the performance of the contract; that Mattingly performed and completed all work required of it under the terms and conditions of its subcontract; that Holloway's claim against Mattingly for damages by reason of the filing of the lien statement was not supported by law or evidence; and that Mattingly should recover of Holloway the sum of $198,110.06. The judgment of the Franklin Circuit Court was affirmed on appeal. Review was granted on June 27, 1978.

The question for primary inquiry is whether the parties intended to operate under, and be bound by, the terms and conditions of Contract A or Contract B. The trial court refused to recognize Contract B and limited the inquisition and the determination as to the rights of the parties pursuant to Contract A. With respect to Contract B, the Court of Appeals said: "We think contract 'B', relied upon by appellant, has a tendency to be injurious to the public and against the public good and is therefore not enforceable." In other words, the Court of Appeals held that Contract B was against public policy and not enforceable. It also held that Contract B was in violation of KRS 176.100.

KRS 176.100 provides:

"No contractor shall deviate from the provisions, plans or specifications upon which a contract has been awarded without first having obtained written authority from the department to do so. If the contractor does deviate without such authority, neither the state of Kentucky, the department of highways, the department of finance nor the state treasurer shall pay or be liable for any work or material not fully provided for in the original contract."

Holloway was not limited by the provisions of the primary contract as to the amount of work which could be subcontracted, so long as the work subcontracted amounted to less than 50% of the total contract costs.

■ In considering the legality of Contract B, we recognize the sacred right to contract without undue interference. *Commonwealth v. L. G. Wasson Coal Mining Corp.*, Ky., 358 S.W.2d 347 (1962). There is no magic in contracts for highway construction. The statutes, rules and regulations of the Department must be construed with every effort being made toward not interfering with the individual's right to contract, to the extent that justice will be afforded the parties. First of all, KRS 176.100 not only prohibits a primary contractor from deviating from his contract but goes further and provides a penalty for the deviation. The penalty so provided is that, "neither the state of Kentucky, the department of highways, the department of finance nor the state treasurer shall pay or be liable for any work or material not fully provided for in the original contract." This

statute is for the benefit of the state and it has limited the penalty to a denial of liability. Other than that, no penalty is provided, and we will not create one by denying the parties the right to contract as between themselves. *Kentucky Utilities Co. v. Carlisle Ice Co.*, 279 Ky. 585, 131 S.W.2d 499 (1939). The parties, knowingly and willingly, put themselves in the position of contracting by dual contracts, and we will leave them there. So much for KRS 176.-100.

We now turn our attention to whether Contract B is contrary to public policy. This court defined public policy as follows:

". . . Public policy has been defined as being the equivalent to the policy of the law, and is a principle of law which holds that no one can lawfully do a thing which tends to be injurious to the public or is contrary to the public good. 32 Cyc. 1251. The good of the community, in certain cases, is relied upon to restrict the freedom of contracting. The public policy must be looked for in the Constitution and statutes and the decisions of the courts of last resort of a state, and where there is no legislative prohibition of a certain character of agreement before a court is authorized to declare it void, it must appear that such an agreement or contract has a tendency to injure the public or is against the public good, or is contrary to sound policy and good morals." *City of Princeton v. Princeton Electric Light and Power Co.*, 166 Ky. 730, 179 S.W. 1074, p. 1078 (1915).

We need to ask ourselves, in what way is Contract B contrary to public policy? Does Contract B have a tendency to be injurious to the public? Had Contract B been submitted to the Department for approval, it, together with other work which had been subcontracted, would have exceeded 50% of the cost price of the primary contract. The Department would have rejected it and Mattingly would not have received the contract. Holloway would have had to seek elsewhere for someone to do the work called for by Contract B at a lesser amount of money, or Holloway would have had to divide the work or do part of the work itself. In either event, this would have resulted in a loss to Mattingly of part of the work which it actually received under Contract B. Time was of the essence in the completion of the work, and the delay in the reletting of the contract or in reallocating the work that Mattingly could do would have taken valuable time. As it was, when the project was finally completed, there were over 13 days of unjustified delay, for which Holloway was charged by the Department at the rate of $750 per day. In any event, Mattingly knew at the time of the signing of the two contracts that the purpose for which they were executed was to permit Mattingly to have a greater share of the project work than would have been given to him under Contract A.

The primary contract was for a fixed amount of money. No assignment or arrangement between Holloway and Mattingly could increase the financial obligation of the Department under the primary contract. Gobel Mattingly, President of Mattingly Bridge Company, Inc., had been in the highway construction business for approximately 17 years and surely was not so naive when he signed both contracts as to believe that Contract B was just for show or, better, was not for show. The Department has not complained that more than 50% of the project costs had been subcontracted to Mattingly. How can Mattingly, having received the fruits of Contract B, now complain?

Next, we need to consider whether Mattingly operated under Contract A or Contract B. Holloway contends for Contract B; Mattingly argues for Contract A.

■ The scope of the work covered by the two subcontracts is nearly identical. They differed only as we have heretofore pointed out. Let us remember that under Contract A Mattingly was only required to place the materials, not furnish them, while under Contract B Mattingly was not only obligated to furnish materials but to place them. With this increased obligation under Contract B, Mattingly received a relatively large increase in compensation. The action

in the Franklin Circuit Court, regardless of what else it may be called, resolved itself into a suit for an accounting. Of course, to have an accounting, it was necessary for the trial judge to determine whether the parties operated under Contract A or Contract B. The trial judge gave effect to Contract A, while refusing to recognize Contract B in any respect. When more than one contract is executed simultaneously and the contracts contain conflicting provisions, the rights and liabilities of the parties are evidenced by their conduct, and parol evidence may be introduced to establish the intention of the parties. In *Thompson v. Fairleigh*, 300 Ky. 144, 187 S.W.2d 812 (1945), we said:

". . . There is an old saying of an English judge: 'Show me what the parties did under the contract and I will show you what the contract means.' So it is, where the terms of a contract are unclear, the practical interpretation of the parties as manifested by their action under it is accepted as of considerable influence by the courts in construing those terms. . . ."

The record reflects that, as specifically provided for under paragraph 15(2) of Contract B, Holloway paid for all materials purchased by Mattingly and, when Mattingly had ok'd the bills for payment, deducted the same in full from the payments due Mattingly. The evidence clearly demonstrates and, as a matter of fact, the opinion of the Court of Appeals recognizes, "that appellee's complaint was apparently based upon a computation of the amount due it under Contract B. . . ." The parties pleaded the case under Contract B, and the trial court should have settled the accounting of the parties according to the terms and conditions of Contract B.

■ Holloway attempted to introduce into evidence the field notes made by O. L. Jones, construction superintendent on the project for Holloway. Jones was deceased at the time of the trial and, of course, could not testify as to the entries. The trial court refused to permit the introduction of the field notes since they could not be properly proven by the person who had made them and he would not be available for cross-examination. The evidence is replete with testimony from several witnesses, both for Holloway and Mattingly, relating to consultations and conferences with Jones affecting the project and the operation of the parties. The effect of the refusal to permit the field notes to be filed into evidence is to leave uncontradicted any and all testimony attributed to or in which Jones was charged with participating, especially in view of the charges and countercharges of the parties. The field notes may have had a direct effect on the disposition of the issues by the trial court. We believe that under the provisions of the shop-book rule, as well as the regular business-entries rule, the field notes should have been admitted in evidence. Kentucky Evidence Law Handbook, Robert G. Lawson, Chapter 8, Section 8.65.

■ Is the recovery of liquidated damages for delay in completion of a contract by a primary contractor against the subcontractor dependent upon the liability of the contractor for liquidated damages under the prime contract? This calls for a "yes" and a "no" answer. First of all, if the contractor has been held liable under the terms and provisions of the primary contract for liquidated damages for delay in completion of the whole project and the delay was occasioned by no fault of the subcontractor, then why in good conscience should the subcontractor be penalized for what is not his fault? On the other hand, if the delay was occasioned by the fault of the subcontractor, why should he not respond in damages to the degree that his fault bears to the whole of the penalty inflicted against the primary contractor? Also, we must bear in mind that the parties between themselves, by their subcontract, may fix a completion date different from that contained in the primary contract, in which event, as between the subcontractor and the primary contractor, the subcontract would fix the liability. The trial court found that any delay in the completion of the project was not occasioned by the fault of Mattingly, and it refused to assess any damage

against Mattingly. The Court of Appeals affirmed that action.

 In view of the fact that we have determined that the trial court and the Court of Appeals erroneously considered the facts as they related to Contract A and fixed liability accordingly, when the trial court should have fixed liability under Contract B, and in view of the fact that this court has found that the case should have been determined under Contract B, any liability between the parties in this respect should be considered under the terms of Contract B.

The decision of the Court of Appeals and the judgment of the Franklin Circuit Court are reversed. The case is remanded to the Franklin Circuit Court for a new trial in keeping with this opinion.

All concur, except CLAYTON, J., who dissents.

CLAYTON, Justice, dissenting.

I agree with the Court of Appeals that "subcontracts submitted for approval by the Department of Highways should accurately reflect the agreement of the contracting parties and should accurately show the scope and extent of the subcontract . ." "The true agreement between a prime contractor and subcontractor will be submitted to the department for approval only if the courts refuse to enforce any secret agreement, the true terms of which have been misrepresented to the department." I would affirm the decision of the Court of Appeals.