APEX CONTRACTING, INC., Movant,

v.

WILLIAM ROBINSON CONSTRUCTION CO., INC., Respondent.

No. 78–SC–145–DG.

Supreme Court of Kentucky.

Rendered May 1, 1979.

Gordon W. Moss, Hays & Moss, Lexington, for appellant.

Larry C. Allen, London, for appellee.

STERNBERG, Justice.

This appeal is the result of a breach of a highway construction contract. For convenience, the Apex Contracting, Inc., will be referred to as "Apex," the William Robinson Construction Co., Inc., will be referred to as "Robinson," and the Commonwealth of Kentucky, Department of Transportation, Bureau of Highways, will be referred to as "Department." Pursuant to KRS, Chapter 176, the Department advertised for bids for the renovation of the Henderson By-Pass at Henderson, Kentucky. Apex was the successful bidder and was awarded the primary contract. Apex subcontracted a portion of the work to Robinson. Difficulties arose between the two companies, which resulted in Robinson being fired from the project and the completion of the subcontract being taken over by Apex. Apex filed a complaint in the Bourbon Circuit Court seeking to recover damages from Robinson for its failure to carry out the provisions of the Apex-Robinson subcontract. The trial court found that Apex was entitled to the relief sought in the complaint and entered judgment against Robinson in the sum of $60,436. The Kentucky Court of Appeals found that the subcontract was illegal and unenforceable, as being contrary to the public policy of this state. Thereupon, it reversed the judgment of the lower court, with directions that the trial court enter a new order dismissing the complaint. Review was sought by movant and was granted by this court on June 27, 1978.

The issues presented to this court are:

1. Is the contract between Apex and Robinson contrary to public policy and, hence, unenforceable?

2. May one party to a contract be declared in default for refusing to do what is not required by the terms of the contract?

In our consideration of the legality of the Apex-Robinson contract, we will recognize their sacred right to contract without undue interference. *Commonwealth v. L. G. Wasson Coal Mining Corp.*, Ky., 358 S.W.2d 347 (1962). The project was jointly participated in by the federal and state bureaus of highway construction. One of the regulations common to both federal and state requirements limited the amount of work that the primary contractor could subcontract to less than 50% of the primary contract. This limitation was incorporated in the primary contract. The Apex-Robinson contract contained a provision incorporating the terms of the prime contract and the regulations of the federal and state bureaus for highway construction as parts thereof. In garnering information which it could use in preparing its bid for the prime contract, Apex conferred with and secured suggested prices from Robinson for the dirt, concrete, and pipe portions of the project. These suggestions were used by Apex as a basis for computing and arriving at its bid on the prime contract. Neither at the time that Apex submitted its bid for the prime contract nor at the time it was awarded the prime contract had Apex contracted with Robinson.

Before submitting the subcontract for approval, Apex learned that Robinson had not qualified with the Department for the full amount of its subcontract work and that when the bid price of Robinson was added to the bid price of another subcontractor the subcontract work would exceed 50% of the prime contract. With these obstacles facing it and in order to secure the approval of Robinson by the Department for a least a portion of the work and in order that the project proceed expeditiously, Apex removed two pages from the subcontract when it was submitted to the Department for approval. This eliminated excavation, borrow, and water portions of the subcontract and placed the contract in proper pos-

ture for approval. Prior to the Department's approval, Robinson knew of the contract changes and knew the reasons for the changes. It concurred in the altered program and proceeded to perform the overrun work even prior to the approval of the altered contract by the Department. Had the contract been submitted to the Department for its approval as originally drawn, approval would have been denied. Apex then would have had to rebid the subcontract, which would have caused further delay. The prime contract is dated August 17, 1973, and the Apex-Robinson subcontract is dated September 28, 1973.

While awaiting the approval of Robinson by the Department, Apex put off commencing its work and permitted Robinson to start work by placing its personnel on the payroll of Apex. This did not result in any change in the bottom-dollar figure which Apex had contracted to pay to Robinson. The practice of a subcontractor in performing a portion of its work by placing its employees on the payroll of the general contractor is recognized in the industry. Although this practice is frowned on by the Department, nevertheless, it is permitted under terms and conditions designated by the Department. Money-wise, it did not increase the cost to the Department. It did, however, increase the overhead expenses of Apex by additional bookkeeping, such as preparing payroll checks, which entailed the computing and making of the usual and proper withholding deductions, making reports, and carrying Robinson's employees on its list for purposes of workmen's compensation. Robinson advised the Department's engineers in the spring of 1974 that it was doing the overrun subcontract work by placing its employees on the payroll of Apex. The Department did not disallow Robinson's continuing to work in this manner; however, it did demand that the Robinson equipment to be leased to Apex while doing its work as an employee of Apex. In this, Robinson procrastinated, and, as revealed by the record, the lease was never executed by Robinson.

It was understood that the whole project could not be completed before the winter of 1973–1974. In such cases the Department permits a grace period from December 1 to the following April 1. By the terms of its subcontract, Robinson was obligated to commence work within ten days after having been notified by Apex to do so. Robinson was required to prosecute the work with diligence so as, in the opinion of Apex, to permit completion of the whole project within the time prescribed by the prime contract, and it also provided that time was of the essence. Robinson was responsible for closing down the project for the winter of 1973–1974. This, it did to the satisfaction of the Department's engineers only after making two trys at it. At that time Robinson was about five weeks behind schedule. Also, Robinson was several weeks slow in getting the project started again in the spring and was dilatory in proceeding with the work. The delay was to such an extent that Apex was in danger of liability for liquidated damages on the primary contract.

Although it was not raised by the parties, the Court of Appeals of Kentucky saw fit to discuss the method used by Apex in establishing the unit price on the subcontract as submitted to the Department for approval. The bid as submitted included a sum of money equal to 5% of the amount bid. This was to cover overhead expenditures. It did not reduce the amount of money due to Robinson, nor did it increase the financial obligation of the Department. The primary contract was for a fixed price, and the Department was obligated for a definite sum of money and no more. Apex was obligated to Robinson on its subcontract, which, by this procedure, was not reduced in one iota. The Court of Appeals deemed this practice to be a "kickback," and held that this subcontract was contrary to public policy. This court defined public policy as follows:

"  *  *  *  Public policy has been defined as being the equivalent to the policy of the law, and is a principle of law

which holds that no one can lawfully do a thing which tends to be injurious to the public or is contrary to the public good. 32 Cyc. 1251. The good of the community, in certain cases, is relied upon to restrict the freedom of contracting. The public policy must be looked for in the Constitution and statutes and the decisions of the courts of last resort of a state, and where there is no legislative prohibition of a certain character of agreement before a court is authorized to declare it void, it must appear that such an agreement or contract has a tendency to injure the public or is against the public good, or is contrary to sound policy and good morals." *City of Princeton v. Princeton Electric Light and Power Co.,* 166 Ky. 730, 179 S.W. 1074, p. 1078 (1915).

We need to consider the relative position of the parties in carrying out the primary contract and the subcontract and the qualifications of the parties to do and perform the work for which they had contracted. In this appeal, a kickback would indicate that Apex was in some way taking advantage of Robinson. Apex did not receive a gratuity or inducement for the subcontract. There is nothing in the record to indicate that the parties dealt with each other in any manner but at arm's length. We have been unable to find a hard and fast definition of a kickback. The expression has been given a variety of meanings. It could mean a forced return of part of one's wages, or the granting of a gift or a gratuity as an inducement for the awarding of a contract, or the practice of permitting one party to charge the other for the privilege of being awarded a contract. The 5% inclusion was not made against Robinson; it merely permitted Apex to recover a part of its fixed-dollar prime contract bid to defray the overhead expenses.

Robinson is hard pushed to complain about a program to which it had agreed and in which it had participated. The record does not reflect that Apex cheated anyone. On the contrary, Apex went out of its way (1) to assist Robinson in qualifying with the Department as a subcontractor; (2) in permitting Robinson prior to qualifying to carry out part of its contract as an employee of Apex; (3) in overcoming the limitation on the amount of work that could be done by Robinson as a subcontractor; (4) in permitting Robinson to become five or six weeks behind schedule at the time the project was closed for the winter; (5) in countenancing Robinson in its efforts at closing the project for the winter and in its delay in beginning the project in April 1974 without a full crew of employees, and (6) in permitting slow progress irrespective of urgings from Apex and the Department's engineers. Robinson knew that Apex was facing liquidated damages on its prime contract by reason of slow progress. In spite of this, Robinson refused to put a full crew to work or, as a matter of fact, to undertake the project expeditiously in the spring of 1974, unless it be paid more money than that for which it had contracted. Robinson was holding out for more money. Robinson knew that by refusing to sign the equipment lease, even after being admonished by the Department's engineers, that it could not continue its contract by having its employees on the payroll of Apex. It knew that it had not constructed a guardrail; that it had permitted the whole project to become a safety hazard; that its delay was increasing the cost to Apex; and that, when dismissed from the job, it had done only 5% to 6% of the dirt work, whereas it should have completed 25% to 50% of the work.

*Zeitz v. Foley,* Ky., 264 S.W.2d 267 (1954), is a case in which a defense of illegality of contract was made. In considering such a defense, we said:

"If it clearly appears that a contract has as its direct object and purpose a violation of the Federal or state constitution, Federal or state statutes, some ordinance of a city or town, or some rule of the common law, courts will not lend their aid to its enforcement. However, contracts voluntarily made between competent persons are not to be set aside lightly. As the right of private contract is no small part of the liberty of the citizen, the usual and most important function of courts is to enforce and main-

tain contracts rather than to enable parties to escape their obligations on the pretext of public policy or illegality. If the legality of the contract can be sustained in whole or in part under any reasonable interpretation of its provisions, courts should not hesitate to decree enforcement."

■ The Apex-Robinson contract awarded work to a subcontractor on the Henderson By-Pass. The objective of the prime contract was to remedy a highway hazard as expeditiously as possible, evidenced by the statement in the prime contract that time was of the essence. Robinson had failed to comply with its contract and Apex found it necessary to take over a portion of the work Robinson was supposed to do. Robinson cannot now escape its obligation on the pretense of public policy or illegality of contract.

Robinson argues that it could not be deemed to be in default for refusing to do what it was not required to do. The Apex-Robinson contract provided that in the event Robinson did not prosecute the work with such diligence as to permit completion of the whole project within the time prescribed by the prime contract, Apex then was authorized to take over and complete the work. On June 10, 1974, Apex declared Robinson in default. The notification is as follows:

"Dear Mr. Robinson:

Reference is made to the above subcontract which we entered into with you, dated September 28, 1973, for subcontracting work on the above project.

We have been informed on this date, by your attorney, Larry Allen, that you do not intend to proceed further with the subcontract. We have made every effort to assist you in fulfilling your obligations under this contract and have fully performed our part of this agreement.

Based upon your rejection of this contract, we are hereby formally notifying you that we have declared you to be in default under the terms of the contract as of this date. We are attempting to complete your work at our expense and if the final costs of the work exceed your original contract price then we will look to you to pay the difference to our company as damages.

Please contact me if you have any questions concerning this matter.

Sincerely,

Frank Whitney."

This action by Apex in firing Robinson apparently was not predicated on the alleged failure of Robinson to execute the equipment rental lease, but on the manner in which the work was done and the progress with which Robinson carried out its contract. The record reveals sufficient grounds for Apex to fire Robinson as it did. The trial court did in fact conclude, "that Robinson breached its contract with Apex due to its defaults with respect to both delays and defective work."

■ We do not meet the query of whether Apex could fire Robinson for refusing to do what is not required by the contract. As a matter of fact, we find that Robinson did not do the work required by the contract, much less that which was not required.

The decision of the Court of Appeals is reversed, and the judgment of the Bourbon Circuit Court is affirmed.

All concur, except CLAYTON, J., who dissents.

CLAYTON, Justice, dissenting.

I dissent for the reasons stated in my dissent in *Holloway & Son Construction Company, Inc. v. Mattingly Bridge Company, Inc.,* Ky., 581 S.W.2d 568, decided this day.